J-A07039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: L.G.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L., MOTHER | |
| | No. 1475 MDA 2024 |

Appeal from the Decree Entered September 13, 2024
In the Court of Common Pleas of Lancaster County
Orphans' Court at No: 2023-02301

BEFORE: BOWES, J., OLSON, J., and STABILE, J.:

MEMORANDUM BY STABILE, J.: **FILED: JULY 18, 2025**

C.L. ("Mother") appeals the September 13, 2024, decree that involuntarily terminated her parental rights to her biological daughter L.G.L., born in April 2022.[1]  After careful review, we affirm.

We glean the pertinent factual and procedural history of this matter from the certified record.  Mother and Father (collectively, "Parents") met in the summer of 2021 and eventually began living together in Coatesville, Chester County, Pennsylvania.  **See** N.T., 4/23/24, at 83-84.  L.G.L. was born,

_____

[1] On September 9, 2024, the orphans' court granted a petition for voluntary relinquishment filed by A.M.-H. ("Father") and terminated Father's parental rights.  We note that Father subsequently sent a pro se letter to the orphans' court expressing his apparent desire to "recant" his consent to relinquishment.  **See** Letter, 10/8/24, at 1 (unpaginated).  This letter appears on the orphans' court docket, although there is no indication that the orphans' court took any action with respect to this mailing.  Nonetheless, Father did not file an appeal.

prematurely, in April 2022 and spent the first three months of her life in a neonatal intensive care unit ("NICU"). *See id*. at 88, 50.

While L.G.L. was in the NICU, Father physically assaulted Mother by strangling her and, on another occasion, striking her on the chest hard enough to cause bruising. *See id*. at 85-86, 90-91. The strangulation incident led to Father's arrest and imprisonment on unclear criminal charges that were eventually resolved through an undescribed plea deal. *See id*. at 86.

These incidents of domestic violence resulted in Chester County Children and Youth Services becoming aware of the family and conducting a home visit. *See id*. at 95. Following Father's release on bail and upon L.G.L.'s release from the NICU into Parents' custody on July 11, 2022, the family quickly relocated to Lancaster, Lancaster County, Pennsylvania. *See id*. at 94-95.

On July 13, 2022, Mother took L.G.L. to a post-NICU wellness check with her pediatrician in Chester County. *See* N.T., 5/7/24, at 12-13. During this examination, bruising was discovered upon L.G.L.'s body, which was reported to Chester County authorities. *See id*. at 13-14; N.T., 4/23/24, at 32-33.

Due to Parents' relocation, Chester County officials referred the family to the Lancaster County Children and Youth Social Service Agency ("CYS" or "the Agency"). *See* N.T., 4/23/24, at 32-33. The Agency then referred L.G.L. to Lancaster General Hospital for a "skeletal survey," which is "a complete set of x-rays of the entire skeleton of the body." *Id*. at 33. This examination was

also performed on July 13, 2022, and revealed no obvious indications of injuries aside from the aforementioned bruising.[2] *See id*. at 33-34.

For the next three weeks, L.G.L. remained in Parents' exclusive care. During this time period, Mother indicated that she noticed that Father was holding L.G.L. "too tightly." N.T., 5/7/24, at 16-17. During subsequent interviews with law enforcement, Mother also admitted that she witnessed Father "squeezing and shaking" L.G.L. on a video baby monitor. *Id*. at 42-43. On or about August 2, 2022, Mother reported that L.G.L. turned "purple and looked like she wasn't breathing" while Father was feeding her, which caused Mother to faint. *Id*. at 33-35. Although emergency medical technicians ("EMTs") responded to Parents' apartment and Mother was briefly hospitalized, it is unclear whether L.G.L. was evaluated since her respiratory symptoms resolved by the time EMTs arrived on the scene. *See id*. at 36-38. During subsequent questioning, however, Mother reported observing L.G.L. still struggling to breathe later that evening. *Id*. at 89.

On the morning of August 3, 2022, Mother reported that L.G.L. was not "eating regularly" and appeared "groggy" and "tired." *Id*. at 20-21. The same day, Mother took L.G.L. to a previously scheduled wellness check with her pediatrician in Chester County. *See id*. at 21. During this examination,

_____

[2] As discussed further *infra*, Allan De Jong, M.D., testified that skeletal fractures such as "rib injuries" in infants may sometimes only be detectable one to two weeks after occurrence. N.T., 4/23/24, at 33.

L.G.L.'s primary care physician noticed "abnormal breathing patterns" including "agonal respirations," which were indicative of "the act of dying." N.T., 4/23/24, at 28-29. L.G.L. was immediately transported to Chester County Hospital, at which point the child began suffering seizures and required "respiratory support" from a ventilator to continue breathing. *Id*. at 25. Due to the severity of her condition, L.G.L. was transferred to Nemours Children's Hospital in Wilmington, Delaware ("Nemours"). Physicians and authorities eventually learned that L.G.L. had endured "severe" and "life-threatening" injuries in the three weeks she spent in Parents' custody. *Id*. at 19.

Specifically, L.G.L. suffered fourteen broken ribs on her right side and twelve broken ribs on her left side. *See id*. at 13. She had fractures of "her left and right ulna and left and right radius," which are the "the two bones in the lower forearm." *Id*. L.G.L. also sustained similar breaks to "her left fibula and right tibia, which are the bones in her lower leg." *Id*. She had also experienced a "skull fracture" on the right side of her head. *Id.* at 13-14. In addition to skeletal injuries, L.G.L. sustained subdural hematomas to essentially the entire surface of her brain, which were caused by "shearing injuries to the blood vessels." *Id*. at 14. There was also evidence that L.G.L. had suffered a hypoxic brain injury, wherein portions of her brain were cut off from circulation and died. *See id*. at 14, 21. Finally, L.G.L. also sustained "damage to the ligaments of her three upper cervical vertebrae." *Id*. at 14. She was approximately four months old when these injuries occurred.

Given both her young age and prematurity at birth, the physicians at Nemours concluded that she could not have caused these injuries to herself. *See id*. at 15. Furthermore, her injuries were determined to be "nonaccidental" in nature and indicative of child abuse. *Id*. The treating physicians opined that L.G.L.'s numerous skeletal fractures had occurred gradually over a period of several weeks while L.G.L.'s head trauma had occurred immediately prior to her hospitalization. *See id*. at 30-31

During the ensuing investigation, Father admitted that he had regularly "squeezed" L.G.L. in his arms while trying to "put her" to sleep. *Id*. at 49. He also admitted to "squeezing" L.G.L.'s head in his hands and failing to provide proper support to L.G.L.'s head while moving her. N.T., 5/7/24, at 41. He was charged with multiple counts of aggravated assault and endangering welfare of children ("EWOC"). *See* N.T., 4/23/24, at 50-51. Mother was also charged with EWOC in November 2022. *See* N.T., 5/7/24, at 90-91. These charges were pending during these proceedings. *See* N.T., 4/23/24, at 4-6.

The Agency's parallel investigation concluded that Mother was indicated as a perpetrator of abuse by both commission and omission. *See id*. at 38, 69. Specifically, the Agency determined L.G.L. was in Parents' exclusive care when these injuries occurred and that Mother failed to protect L.G.L. *See id*.

The Agency petitioned for emergency custody of L.G.L., which the juvenile court granted on August 25, 2022. *See id*. 45, 62. L.G.L. was

immediately placed into the care of R.B. and G.M.B. (collectively, "Foster Parents"), who were identified as a permanent pre-adoptive resource in the certified record. *See id*. at 44-45. On September 14, 2022, the juvenile court granted a petition filed by the Agency and adjudicated L.G.L. dependent.

Contemporaneously, the Agency also submitted a request for a finding of aggravated circumstances as to Parents. Following a hearing, the juvenile court granted the Agency's motion and entered a finding of aggravated circumstances on November 8, 2022. *See id*. at 70. Due to the "horrific nature" of L.G.L.'s injuries while in Parents' care, the juvenile court further determined that no reasonable efforts should be made to reunify Parents with L.G.L. *See id*. at 41; *see also* 42 Pa.C.S.A. § 6341(c.1) ("If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made."). Along similar lines, this order also precluded Parents from visiting L.G.L. *See* N.T., 4/23/24, at 70.

Also in this order, the juvenile court established L.G.L.'s primary permanency goal as adoption with a concurrent goal of permanent legal custodianship and instituted a dependency plan that did not include any provision for reunification services. Mother did not appeal.

Thereafter, the juvenile court held regular permanency hearings between March 2023 and December 2023, wherein it consistently determined

that Mother's arguable progress and compliance was irrelevant since it had determined that reunification services were not appropriate in this case. Of particular note, the court filed a permanency review order on December 19, 2023, that maintained the status quo described above by, *inter alia*, noting that reunification was not appropriate and that visitation remained suspended. *See* Orphans' Court Opinion, 11/1/24, at 4. Mother appealed at 71 MDA 2024. On February 2, 2024, we quashed after finding the order was not immediately appealable since it merely continued the dependency status quo.

On September 26, 2023, the Agency filed a petition seeking to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3] The orphans' court held hearings on

---

[3] Our Supreme Court has concluded that Pennsylvania appellate courts should engage in "limited *sua sponte* review" to ensure that children have been afforded their statutory right to legal counsel when facing the potential termination of their parents' parental rights. *In re Adoption of K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020). Specifically, we must examine: (1) whether the orphans' court appointed legal counsel for the child as required by 23 Pa.C.S.A. § 2313(a); and (2) where a dual legal counsel and guardian *ad litem* was appointed to represent both the child's legal and best interests, whether the orphans' court determined that those interests did not conflict. *See id*.

While there is no order appointing counsel for L.G.L. pursuant to Section 2313(a), it is clear that L.G.L.'s guardian *ad litem* from the dependency proceedings, Pamela Breneman, Esquire, acted as L.G.L.'s legal counsel throughout these termination proceedings. In its September 9, 2024 decree, the orphans' court clarified Attorney Breneman's role, as follows: "In this case, the guardian *ad litem* is also legal counsel for L.G.L. The court finds that there is no conflict between the child's best interests and legal interests and no impediment to the legal counsel advocating for the child's best interests, and vice versa." Decree, 9/9/24, at 15 (capitalization cleaned up).
*(Footnote Continued Next Page)*

April 23, May 7, and June 4, 2024. At the time of these hearings, L.G.L. was approximately two years old. Therein, the Agency adduced testimony from CYS caseworkers Whitney Szobocsan-Shank and Sharlene King, and Dr. Jong, who was co-director of Nemours's Children at Risk Evaluation Program. Mother testified on her own behalf and also presented testimony from L.G.L.'s maternal grandmother. Additionally, various exhibits from the dependency and criminal proceedings concerning L.G.L. were introduced and admitted into the record by the orphans' court.

On September 13, 2024, the orphans' court filed a decree that involuntarily terminated Mother's parental rights and also set forth the court's

_____

We respectfully remind the orphans' court that it must render a determination regarding potential conflicts "**before** appointing an individual" to serve as dual counsel. **K.M.G.**, 240 A.3d at 1236 (emphasis added). Nonetheless, there is no question that Attorney Breneman represented L.G.L. in the above-captioned matter as her guardian *ad litem*. Furthermore, L.G.L. was approximately two years old and pre-verbal at the time of these proceedings. Our Supreme Court has held that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests." **In re T.S.**, 192 A.3d 1080, 1092 (Pa. 2018). Under such circumstances, "the mandate of Section 2313(a) . . . is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings." **Id**. at 1092-93. Even though there is no order formally appointing Attorney Breneman to represent L.G.L. in this case, "we are disinclined to elevate form over substance" when there is no question that L.G.L. was represented by counsel. **Id**. at 1090 n.19.

Based upon the foregoing, we discern no structural error with respect to L.G.L.'s entitlement to counsel pursuant to **K.M.G.** and Section 2313(a). Nonetheless, we wish to impress upon the orphans' court that the "better practice" would have been to render a conflict determination and then properly formalize Attorney Breneman's appointment in this matter. **Id**.

factual and legal rationale. On October 9, 2024, Mother timely filed both a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On November 1, 2024, the orphans' court filed a responsive Rule 1925(a)(2)(ii) opinion that repeated the reasoning set forth in the court's September 9, 2024, decree.

Mother has raised the following issues for our consideration:

I. Whether the court erred in ruling during the pendency of this case that Mother should not be granted a child permanency plan with a goal of reunification with her child due to her pending criminal charge of EWOC?

II. Whether the court erred in concluding that Mother failed to rebut the presumption that she failed in her duty to protect the child from abuse at the hands of Father pursuant to 23 Pa.C.S.A. § 6381(d)?

III. Whether the court erred in concluding that the Agency proved by clear and convincing evidence that Mother's parental rights should be terminated pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b)?

Mother's Brief at 8 (cleaned up; issues reordered for ease of disposition).

Mother's first claim concerns the aggravated circumstances finding that, *inter alia*, determined no reasonable efforts towards reunification would be undertaken for Mother's benefit.[4] **See** Mother's Brief at 14-20. Mother appears to have conflated the distinct legal proceedings at issue in her

---

[4] To the extent that Mother's discussion of this issue also includes arguments pertaining to the orphans' court's findings pursuant to Section 2511(a)(1) and (a)(2), we decline to address that aspect of Mother's arguments for the reasons stated *infra* in footnote 6 of this writing. **Cf**. Mother's Brief at 22.

arguments. *See Interest of S.S.*, 252 A.3d 681, 688 (Pa. Super. 2021) (recognizing that dependency proceedings and termination proceedings are two separate, distinct proceedings "with their own docket numbers, records, and divisions within the Court of Common Pleas."). The instant appeal solely concerns the termination decree entered by the orphans' court. To the extent Mother is also seeking appellate review of the juvenile court's aggravated circumstances holding, we emphasize that "decision was issued by a separate order, on a separate docket, and technically by a separate court." *In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021). Stated simply, Mother is inappropriately attempting to "bootstrap" these arguments concerning a ruling on the dependency docket onto her termination appeal. *Id*. Since no appeal of the aggravated circumstances decision was taken here, Mother has waived these allegations of error. *See*, *e.g.*, *id*. (holding that a litigant waived arguments concerning a permanency goal change order by only pursuing an appeal with respect to a termination decree). No relief is due.

The remainder of Mother's claims concerns the termination of her parental rights. Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

Mother's second claim for relief challenges the orphans' court's application of Section 6381(d). *See* Mother's Brief at 26-28. This statute provides, in pertinent part, as follows:

**(a) General rule.**—In addition to the rules of evidence provided under 42 Pa.C.S. Ch. 63 (relating to juvenile matters), the rules of evidence in this section shall govern in child abuse proceedings in court or in any department administrative hearing pursuant to section 6341 (relating to amendment or expunction of information).

. . . .

**(d) Prima facie evidence of abuse.**—Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

- 11 -

23 Pa.C.S.A. § 6381(d). Preliminarily, we note that Section 6381(a) suggests that Section 6381 was intended to apply to proceedings in the juvenile court, *i.e.*, dependency, "child abuse proceedings," and other matters governed by the Juvenile Act. 23 Pa.C.S.A. § 6381(a); *see also* 42 Pa.C.S.A. §§ 6301-87. Given that the instant case is **not** governed by the Juvenile Act but by the Adoption Act, it is unclear whether this statutory presumption was intended to apply in termination of parental rights proceedings. Nonetheless, we observe that at least one panel of this Court has permitted the application of Section 6381 to termination matters, albeit in an unpublished writing that did not discuss the provisions of Section 6381(a). *See In re Adoption of C.G.*, 240 A.3d 907, at *6 n.9 (Pa. Super. 2020) (Table). In any case, no party has challenged the application of Section 6381 to these proceedings. As such, we will evaluate this issue on its merits without addressing statutory applicability.

The application of Section 6381(d) "triggers a rebuttable presumption" that a parent or other responsible caregiver perpetrated the complained-of abuse. *Interest of S.A.S.*, 305 A.3d 1039, 1051 (Pa. Super. 2023). Notably, this presumption "encompasses situations where the parent or responsible person is not present at the time of injury but is nonetheless responsible due to his or her failure to provide protection for the child." *In re L.Z.*, 111 A.3d 1164, 1184 (Pa. 2015). This presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence." *S.A.S.*, 305 A.3d at 1051 (citing *In re S.L.*, 202 A.3d 723, 728 (Pa. Super.

- 12 -

2019)). Specifically, an individual may rebut by "'demonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive.'" *Id*. (quoting *Interest of G.R.*, 282 A.3d 376, 382 (Pa. Super. 2022)). Ultimately, however, the evaluation of the validity of the presumption rests with "'the trial court evaluating the credibility of the *prima facie* evidence presented . . . and the rebuttal of the parent or responsible person.'" *Id*.

In its Rule 1925(a)(2)(ii) opinion, the orphans' court indicated that the presumption pursuant to Section 6381(d) was a key part of its reasoning for granting termination. *See* Orphans' Court Opinion, 11/1/24, at 9-14. Furthermore, the court concluded that Mother had failed to rebut the presumption, reasoning as follows:

> The [c]ourt finds Mother to be a person responsible for [L.G.L.] at the time of her injuries. At the time of the hearing, Mother was not only an indicated perpetrator of abuse but also facing pending criminal charges for [EWOC] due to her role in the abuse of [L.G.L.] . . . . Mother was aware that Father was evil and abusive and yet she allowed [L.G.L.] to remain in his care despite this knowledge. Therefore, she cannot be considered blameless for the resulting harm. The only evidence the [c]ourt has in Mother's favor are her own *ipse dixit* statements denying responsibility for the abuse, but these assertions alone are insufficient to absolve her of wrongdoing.

*Id*. at 11. The court also specifically rejected Mother's testimony as "less than credible." *Id*. at 10.

- 13 -

Mother argues the court should have credited her rebuttal testimony, which blamed Father for L.G.L.'s injuries and disclaimed any knowledge that the abuse was occurring. *See* Mother's Brief at 27 ("Mother strenuously disagrees with this conclusion and she continues to argue that not only did she not know that Father was abusing [L.G.L.], that she did not fail in her duty to protect the child."). Upon review, we conclude that no relief is due.

The certified record reveals ample evidence in support of the orphans' court's findings pursuant to Section 6381(d). Indeed, this issue serves to highlight the conflicts in the testimony and evidence added by the Agency and Mother's own version of events. Here, Mother does not dispute that L.G.L. was in her care within the meaning of Section 6381(d) when the child suffered the abusive injuries detailed above. Rather, she contends the presumption should not apply to her because she had no knowledge of the abuse or of Father's violent tendencies. *See* Mother's Brief at 26-27.

Contrary to Mother's claims, however, her own testimony reveals that she was violently assaulted by Father on at least two occasions immediately following L.G.L.'s birth. *See* N.T., 4/23/24, at 85-86, 90-91. Indeed, Father was criminally charged in connection with allegations that he had strangled Mother. *See id*. at 86. To the extent Mother maintains she had no inkling that Father posed a danger of violence to L.G.L., the orphans' court elected not to credit those assertions in light of these undisputed incidents.

Likewise, there is ample support for the orphans' court's disbelief of Mother's assertions that she did not realize that L.G.L. was being abused. Dr. Jong and Mother both testified that L.G.L. began presenting with unexplained bruising just two days after being released from the NICU. *See id*. at 32-33. Thereafter, Mother testified that she noticed Father holding L.G.L. "too tightly" and also admitted that she observed him "squeezing and shaking" the child on a video baby monitor. N.T., 5/7/24, at 16-17, 42-43. Mother also averred that L.G.L. was in respiratory distress on August 2, 2022, which was sufficiently upsetting for Mother to faint. *See id*. at 33-38. Ms. King reported that Mother had admitted she observed L.G.L.'s breathing difficulties continued later on the evening of August 2, 2022. *See id*. at 89. Finally, Mother testified that L.G.L.'s behavior on the morning of August 3, 2022, was troubling and indicative of distress. *See id*. at 20-21.

Despite all of these warning signs over approximately three weeks, Mother took no action to safeguard L.G.L. or prevent the undisputed abuse. It was not until she brought L.G.L. to a previously scheduled wellness appointment that L.G.L.'s pediatrician recognized that the child's life was in peril and sought emergency care. *See* N.T., 4/24/23, at 28-29. Overall, Mother's passivity in the face of these circumstances is quite telling.

We observe no abuse of discretion or error of law in the orphans' court's holding that Mother failed to rebut the presumption at Section 6381(d). Since the evidence supports the orphans' court's credibility determination in this

regard, we may not disturb it. **See M.E.**, 283 A.3d at 829. Accordingly, Mother is not entitled to relief with respect to her second claim.

We now turn to Mother's third and final claim for relief, which challenges the sufficiency of the evidence underlying the orphans' court's termination findings. The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. **Id.** at 830; **see also** 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). We need only agree with the court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm. **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Based upon our review of the certified record, our analysis in this case implicates Section 2511(a)(8) and (b), which provide as follows:[5]

---

[5] By analyzing Section 2511(a)(8), we render no conclusions as to the validity of the orphans' court's findings under Section 2511(a)(1), (2), or (5). **See In re K.R.**, 200 A.3d 969, 979 (Pa.Super. 2018) (*en banc*) (observing this Court may proceed to a review of one subsection of § 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b)

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least 12 months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018).

Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the

child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). Rather, our inquiry is focused upon whether the at-issue "conditions" have been "remedied" such that "reunification of parent and child is **imminent** at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (emphasis added). It is axiomatic that "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* at 11-12 (internal citations and quotation marks omitted).

Finally, this Court has also explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

Preliminarily, there is no dispute that the first factor of Section 2511(a)(8) has been established here. L.G.L. was removed from Mother's care on August 25, 2022. Therefore, at the time of the last termination hearing on June 4, 2024, L.G.L. had been removed for approximately twenty-one months, *i.e.*, more than the statutory minimum of twelve months.

Turning to the second element of Section 2511(a)(8), the orphans' court concluded that the conditions that led to L.G.L.'s removal continued to exist, reasoning as follows: "[D]ue to the extensive level of abuse the [c]hild

- 18 -

endured from her parents, and the passage of time, the [c]ourt cannot simply wait for Mother to **discover** a motherly instinct." Orphans' Court Opinion, 11/1/24, at 13 (emphasis in original). Instantly, L.G.L.'s abuse at Parents' hands was clearly the underlying condition that led to removal.

In her brief, Mother attempts to lay the blame for L.G.L.'s abuse solely upon Father and claims that she has remedied the conditions that led to L.G.L.'s removal by ending their relationship. **See** Mother's Brief at 24 ("Mother ended her relationship with Father immediately after the parties were interviewed by the Lancaster County detectives and Father was taken into police custody."). We find Mother's arguments unavailing.

From the outset of this portion of our analysis, we emphasize that the extent of the injuries that L.G.L. suffered are not subject to dispute in this matter.[6] To the extent that Mother seeks to excuse herself as a perpetrator of abuse, the statutory presumption at Section 6381(d) definitively undercuts this claim. **See** 23 Pa.C.S.A. § 6381(d). While Mother's related criminal charges remained pending at the time of these proceedings, Ms. Szobocsan-Shank's testimony similarly indicated that the Agency's investigation already had determined that Mother was a perpetrator of abuse by both commission

---

[6] This Court's precedent suggests that the presumption at Section 6381(d) is primarily relevant in "making a legal determination as to the identity of the abuser in child abuse cases." **In the Interest of N.M.**, 186 A.3d 998, 1011 n.26 (Pa. Super. 2018). However, "there must still be clear and convincing evidence to establish that the child was abused." **Id**. Instantly, there is no question or dispute that L.G.L. suffered child abuse.

and omission. *See* N.T., 4/24/23, at 38, 69. The orphans' court also found that Mother's denials and excuses lacked credibility.

There are also no indications that Mother has taken any meaningful steps to address or ameliorate her role as a perpetrator of abuse in this case. As noted above, Mother cannot even acknowledge that her actions (and inaction) were wrongful. In the absence of reunification services, Mother testified that she had participated in mental health counseling, attended a domestic violence support group, and completed a parenting class. *See* N.T., 5/7/24, at 45-47. Critically, however, Mother fails to articulate or demonstrate how these endeavors addressed her role as a perpetrator of abuse targeting L.G.L. Simply put, Mother does not demonstrate the connection between the counseling, support services, and parenting class that she sought out and the conditions that led to L.G.L.'s removal, *i.e.*, catastrophic child abuse.

Based upon the foregoing, we observe no abuse of discretion or error of law in the orphans' court's conclusion that the conditions that led to L.G.L.'s removal continued to exist at the time of these termination proceedings.

Turning to the third and final prong of Section 2511(a)(8), we must consider whether termination of Mother's parental rights would best serve L.G.L.'s needs and welfare. In many ways, the testimony of Dr. Jong detailing the injuries suffered by L.G.L. as a result of the abuse perpetrated by Mother speaks most definitively. *See* N.T., 4/24/23, at 13-14, 21. Dr. Jong also

opined that L.G.L. would suffer "long-term disabilities" as a result of these events: "It may be as minor as poor school performance; however, when we see these ischemic injuries, [when] part of the brain actual dies and it's really hard to come back completely back to normal after that." *Id*. at 21.

Dr. Jong also noted that L.G.L.'s head was not growing in proportion to the rest of her body following these injuries. *See id*. at 22-23. Ms. Szobocsan-Shank also testified that L.G.L. is currently suffering myopia that prevents her from seeing anything that isn't "super close" to her eyes. *See id*. at 44. Additionally, Ms. Szobocsan-Shank reported the child struggles with drinking water. *See id*. Consequently, Ms. Szobocsan-Shank testified that L.G.L. receives occupational, speech, and physical therapy. *See id*.

The abuse perpetrated by Mother has caused L.G.L. to suffer life-altering and potentially permanent injuries. Under these circumstances, we observe no abuse of discretion or error of law in the orphans' court's findings.

Based upon the foregoing analysis, we find no abuse of discretion or error of law in the orphans' court conclusion that termination of Parents' rights was warranted pursuant to § 2511(a)(8).

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A.

§ 2511(b); *see also T.S.M.*, 71 A.3d at 267. We remain mindful that "the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," with an eye towards "each child's specific needs." *Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023). This inquiry is neither formulaic, nor mechanical. *See id.*

Our review must include consideration of the bond between the parent and the child. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has explained, however, that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause extreme emotional consequences or significant, irreparable harm. *Id.* at 1109-10. The extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (cleaned up). Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *M.E.*, 283 A.3d at 839 (cleaned up). Courts should also consider "whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *K.T.*, 296 A.3d at 1106. Finally, we also note that a child's "emotional needs and welfare include intangibles, such as love, comfort, security, and stability." *Id.*

In its opinion, the orphans' court concluded that termination was appropriate under Section 2511(b), reasoning as follows:

It is clear to the [c]ourt that Mother presently does not have a grasp of the responsibilities associated with parenting. Thus, due to the tender state of the [c]hild, as a result of the abuse for which Mother bears responsibility, it is in the best interests of the [c]hild to terminate Mother's parental rights. Furthermore, due to the tender age of the [c]hild, the short span of time the [c]hild was in Mother's care and that there is no recognizable bond between Mother and [c]hild, the [c]ourt finds that the Agency proved by clear and convincing evidence that Mother's parental rights should be terminated pursuant to 23 Pa.C.S.A. § 2511(b).

Orphans' Court Opinion, 11/1/24, at 14-15. In challenging these findings, Mother essentially reiterates her arguments above seeking to blame Father for the abuse of L.G.L. *See* Mother's Brief at 25-26.

Our review reveals adequate support for the orphans' court's findings pursuant to Section 2511(b). With respect to our bonding analysis, there is no evidence suggesting any manner of parental bond between Mother and L.G.L. It is well-established under Pennsylvania law that "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). There is no basis upon which to overturn the court's bonding analysis.

While there is no testimony directly addressing if L.G.L. is closely bonded to Foster Parents, we note that Ms. Szobocsan-Shank testified that L.G.L. is doing surprisingly well in their care given the extent of her injuries. *See* N.T., 4/23/24, at 44-45. Ms. Szobocsan-Shank also generally averred that Foster Parents are a permanent, pre-adoptive resource who are providing for all of L.G.L.'s significant medical and day-to-day needs. *See id*.

Viewing these findings in conjunction with the discussion of the consequences of Mother's abusive conduct in Section 2511(a)(8), we find that the orphans' court's findings pursuant to Section 2511(b) are supported by competent evidence and free of legal error. Therefore, we hereby affirm the orphans' court's September 13, 2024, termination decree.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 07/18/2025